**MALTINA CORPORATION and Julio Blanco-Herrera, Plaintiffs-Appellants,**

v.

**CAWY BOTTLING COMPANY, Inc., Defendant-Appellee.**

No. 71-1532.

United States Court of Appeals, Fifth Circuit.

May 23, 1972.

Rehearing and Rehearing En Banc Denied July 11, 1972.

J. W. Gipple, Fleit, Gipple & Jacobson,
Washington, D. C., Phillip W. Knight,

Enrique Jova, Fowler, White, Humkey, Burnett, Hurley & Banick, Miami, Fla., for plaintiff-appellant.

Peter M. Lopez, Miami, Fla., for defendant-appellee.

Before WISDOM, COLEMAN and SIMPSON, Circuit Judges.

WISDOM, Circuit Judge:

In this appeal former owners of a Cuban brewery confiscated by the Castro regime seek to preserve their right to use the United States trademark registered in the name of the confiscated brewery. These efforts met with failure in the district court. The court held that the Act of State Doctrine deprived the former owners' assignee of standing to sue. We hold that the district court applied the Act of State doctrine more broadly than prior decisions allow.

I.

The plaintiff, Maltina Corporation, allegedly is a successor in interest to a Cuban Corporation, Nueva Fabrica de Hielo, S. A. ("Nueva Fabrica"). Nueva Fabrica produced and distributed beer and a "malta" from 1885 until its assets were confiscated by Cuban Law No. 890, on October 13, 1960. "Malta" is a dark brown, non-alcoholic carbonated beverage flavored with malt and brewed somewhat as beer. Nueva Fabrica registered for its Malta the trademark "Cerveza Cristal & design" in the United States Patent Office in 1957.

The family of Nueva Fabrica's President, Julio Blanco-Herrera, owned a controlling 55 percent of the shares of the corporation. The remaining principal stockholders were the Gelats family, who held about 15 percent of the stock. All but a single member of the Executive Committee of the corporation, which governed its day to day operations, fled to the United States when the Cuban Government confiscated the assets of Nueva Fabrica.

As the district court stated: "Sometime during 1961, the Executive Committee met in this country to discuss the affairs of Nueva Fabrica de Hielo, S. A. At this meeting, certain remaining assets of the company were discussed including a small account with the Morgan Trust Company of New York, an account in the First National Bank of New York, and a debt owed by a company in Owens, Illinois. These monies were subsequently recovered and placed in the Dade Federal Savings & Loan Association of Miami. The committee discussed the U. S. trademark and decided to attempt to retain ownership and use of the mark because of the great influx to this country of Cuban nationals who are familiar with the Cristal labels. The committee decided to attempt to obtain the backing of a responsible brewery which would lend its support to a malta made with the Cuban company's formula." Julio Blanco-Herrera initiated such efforts on behalf of the Executive Committee.

During 1962, Dr. de la Carrera, General Counsel for Nueva Fabrica and a member of the Executive Committee, told the Executive Committee that the trademark "Cerveza Cristal" would soon need to be renewed under the provisions of the trademark law.[1] In circumstances not here relevant, Blanco-Herrera executed an affidavit on June 6, 1962, stating that the trademark "Cerveza Cristal & design" was still in use and owned by Nueva Fabrica. In 1963, Blanco-Herrera formed the Maltina Corporation to distribute "Malta Regal", a product of the National Brewing Company. Because Blanco-Herrera and Dr. de la Carrera believed that Nueva Fabrica could not

1. Each certificate of registration shall remain in force for twenty years: *Provided*, that the registration of any mark under the provisions of this chapter shall be cancelled by the Commissioner at the end of six years, following its date, unless within one year next preceding the expiration of such six years the registrant shall file in the Patent Office an affidavit showing that the said mark is still in use or showing that its nonuse is due to special circumstances which excuse such nonuse and is not due to any intention to abandon the mark . . . . 15 U.S.C. § 1058(a).

function legally in the United States, to preserve the "Cristal" trademark, Blanco-Herrera, acting as President of Nueva Fabrica, assigned the mark, together with the good will of the business, to Maltina Corporation. The assignment was recorded at the United States Patent Office on October 22, 1965.

After the purported assignment to Maltina, and while continuing to market Malta Regal, Blanco-Herrera continued his efforts to find backing for Malta Cristal. With Blanco-Herrera's participation, National Brewing Company produced a malta under the Cristal label in January of 1969. Blanco-Herrera testified that from the time he came to the United States in 1960 until a malta was produced under the Cristal label in 1969, he never had any intention to abandon the trademark, but instead made every effort to market his product expeditiously without sacrificing its quality.

The President of the defendant Cawy Bottling Company testified that his company tried to discover whether the Malta Cristal label was in use in this country and discovered that it was not. In October, 1967, Cawy attempted to register the "Cristal" mark with the United States Patent Office, but the application was rejected because of the plaintiffs' prior registration. Cawy had the trademark "Malta Cristal" registered in the office of the Secretary of the State of Florida on October 27, 1967. The Cawy malta was first marketed in February, 1968. On February 12, 1969, Cawy filed a petition with the United States Patent Office seeking to cancel the plaintiffs' registration. Maltina Corporation answered the petition, but the parties stipulated that those proceedings be stayed pending a suit in federal court to resolve the underlying issues. Blanco-Herrera and Maltina filed this action against Cawy in the United States District Court for the Southern District of Florida on March 27, 1970, seeking injunctive, monetary, and other relief from the defend-

ant's alleged infringing activities. See 15 U.S.C. §§ 1114–1118.

At a hearing below on the defendant's motion for summary judgment, Marion Goderich, an expert on Cuban law, testified that the effect of Cuban Law 890 was to dissolve Nueva Fabrica de Hielo, S. A. Goderich based this conclusion on Article 221 of the Commercial Code of Cuba, which provides:

> Companies of any kind whatsoever shall be dissolved for the following reasons:
>
> \* \* \* \* \* \*
>
> (2) Entire loss of capital.

Goderich explained the provision in his testimony:

> Article 221 says that corporations of any kind whatever will be totally dissolved by the causes that follow, and in No. 2 it says, 'total loss of capital' —now, when there is a confiscation, of course, the corporation, as such, loses its capital totally to the Cuban Government, and because there is subrogation, and that's one of the reasons why there is a dissolution of the corporation.

The Court below took this testimony to be "virtually uncontradicted". It held Hielo to have been dissolved, and that the plaintiffs—a crew without a ship— lacked any right to assign the "Cristal" trademark to Maltina. The court expressed distaste for the result it reached, but believed the result compelled by the Supreme Court's decision in Banco Nacional de Cuba v. Sabbatino, 1964, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804. We reverse.

## II.

■■ The Act of State doctrine, as set forth in *Sabbatino*, prevents the federal courts from sitting in judgment "on the acts of the government of another [country] done within its own territory", 376 U.S. at 416, 84 S.Ct. at 934, quoting Underhill v. Hernandez, 1897, 168 U.S. 250, 252, 18 S.Ct. 83, 42 L.Ed. 456.[2]

---

2. Our decision today makes it unnecessary for us to consider the applicability of the so-called "Sabbatino Amendment", 22 U.S.C. § 2370(e) (2). This provision,

We are therefore foreclosed from considering the propriety of the Cuban Government's expropriation of the assets of Nueva Fabrica de Hielo, S. A., accomplished by Cuban Law No. 890, at least as to those assets of Nueva Fabrica within the territorial confines of Cuba at the time of expropriation.

At the same time, it is settled by a long line of cases that "our courts will not give 'extra-territorial effect' to a confiscatory decree of a foreign state, even where directed against its own nationals." F. Palicio y Compania, S. A. v. Brush, S.D.N.Y.1966, 256 F.Supp. 481, 488, aff'd mem., 2 Cir. 1967, 375 F.2d 1011; Tabacalera Severiano Jorge, S. A. v. Standard Cigar Co., 5 Cir. 1968, 392 F.2d 706, cert. den. 393 U.S. 924, 89 S.Ct.

255, 21 L.Ed.2d 260; Compania Ron Bacardi, S. A. v. Bank of Nova Scotia, S.D. N.Y.1961, 193 F.Supp. 814; Zwack v. Kraus Bros. & Co., S.D.N.Y.1954, 93 F. Supp. 963, aff'd., 2 Cir. 1956, 237 F.2d 255. Thus "foreign confiscatory decrees purporting to divest nationals and corporations of the foreign sovereign of property located in the United States uniformly have been denied effect in our courts. . . ." Banco Nacional de Cuba v. Sabbatino, *supra*, 376 U.S. at 447, 84 S.Ct. 923, 950, 11 L.Ed.2d at 834 (dissenting opinion of Mr. Justice White), citing, *e. g.*, Moscow Fire Ins. Co. v. Bank of New York, 280 N.Y. 286, 20 N.E.2d 758, aff'd sub nom. United States v. Moscow Fire Ins. Co., 309 U.S. 624, 60 S.Ct. 725, 84 L.Ed. 986.[3]

also referred to as the "Second Hickenlooper Amendment", states that "no court in the United States shall decline on the ground of the federal act of state doctrine to make a determination on the merits giving effect to the principles of international law in a case in which a claim of title or other right to property is asserted by any party including a foreign state (or a party claiming through such state) based upon (or traced through) a confiscation or other taking after January 1, 1959, by an act of that state in violation of the principles of international law," with two provisos not applicable here. We express no view as to whether the "claim of title or other right to property" asserted by the defendant in the present case is "based upon or traced through" the confiscation by the Cuban Government of the assets of Nueva Fabrica.

3. See Restatement (Second), Foreign Relations Law of the United States § 43 (1965):

(1) The [act of state doctrine] does not prevent examination of the validity of an act of a foreign state with respect to a thing located, or an interest localized, outside its territory if the act has not been fully executed in accordance with applicable law.

(2) A court in the United States will give effect to an act of a foreign state of the type described in Subsection (1) only if to do so would be consistent with the policy and law of the United States.

Comment (a) under § 43 states:

(a) *Property in the United States.* If the act of a foreign state purports

to affect property in the United States, the United States has jurisdiction under the rule stated in § 17 to prescribe rules determining whether the act is to be fully executed, as in the case of reducing expropriated property to possession. The act of state doctrine stated in § 41 becomes applicable only when and if the act has been fully executed. If the act cannot be executed under the applicable rules of conflict of laws and substantive law of the United States, there is no occasion to apply the act of state doctrine, and the courts have refused to do so.

The comment suggests that "full execution" of an act of state for purposes of determining the applicability of § 43 refers to full exercise by the foreign state of dominion over the property in question, not to the documentary execution of whatever legal action the foreign state takes toward the property or its own national. Thus, as we read the illustration, it looks not to execution of a nationalization decree, but rather to exercise of dominion over real property located in the United States. There having been no "reduction of the expropriated property to possession," the rule of § 43 is applicable and the act of state doctrine is not:

State A issues a decree nationalizing property of X, a national of A. The property includes real estate in the United States. In a suit in a court in the United States, X challenges the right of Y, to whom A has assigned the real estate. The act of state doctrine will not be applied.

■■ We also accept the proposition, not seriously questioned in recent years, that "trademarks registered in this country are generally deemed to have a local identity—and situs—apart from the foreign manufacturer." F. Palicio y Compania, *supra*, 256 F.Supp. at 491; Carl Zeiss Stiftung v. V. E. B. Carl Zeiss, Jena, S.D.N.Y.1968, 293 F.Supp. 892, 896, modified on other grounds, 2 Cir. 1970, 433 F.2d 686; Zwack v. Kraus Bros. & Co., 2 Cir. 1956, 237 F.2d 255; Baglin v. Cusenier Co., 1911, 221 U.S. 580, 596, 31 S.Ct. 669, 55 L.Ed. 863. Thus the precise question raised by the present case is whether a foreign sovereign's dissolution of its own corporation is dispositive of the corporation's power to exercise dominion over assets located within the United States simply because the dissolution of the corporation is an "act of a foreign state, done within its own territory"; or whether the foreign sovereign's action is to be treated as a foreign decree governing property located within the United States and therefore to be recognized only if consistent with our policy and laws. Prior decisions uniformly espouse the latter position. In Zwack v. Kraus Bros. & Co., *supra*, the Second Circuit permitted the members of a confiscated Hungarian partnership to sue for damages and injunctive relief for infringement of trade names registered in the United States. In Baglin v. Cusenier Co., *supra*, the Supreme Court held that the Superior General of the Order of the Carthusian Monks could sue in the United States to protect the trademark "Chartreuse", despite action by the French Government dissolving the Order and seizing its property in France. *Compania Ron Bacardi, supra*, involving a Cuban corporation expropriated by the very same Cuban Law—No. 890—before us, held that the directors and "the large majority of the shareholders" of Bacardi could sue in our courts to preserve assets located here. Indeed, we, too, have addressed ourselves to the problem of the effect of dominion over American assets to be given foreign decrees modifying or terminating the powers of a foreign corporation.

In Tabacalera Severiano Jorge, S. A. v. Standard Cigar Company, *supra*, Severiano Jorge sued on behalf of the "intervented" corporation and on his own behalf as assignee of the corporation to recover $100,000 from Standard. The money represented the purchase price of tobacco sold and delivered to Standard (of Tampa, Florida) a few months before the Cuban Government "intervened". The district court denied recovery, reasoning that 1) the acts of the Cuban Government had withdrawn from the Corporation and its officers and directors the right to collect corporate debts and 2) the Act of State doctrine precluded our federal courts from questioning this action of the Cuban Government.

We reversed, holding, first, that careful consideration of the acts of the Cuban Government revealed it had taken no steps to interfere with Tabacalera's attempts to collect moneys owing it in Tampa, Florida. The intervention, we said, created "a limited temporary receivership which did not attempt to cancel an outstanding power of attorney" vested in Severiano Jorge, 392 F.2d at 714. But, perhaps out of concern lest we suggest that more drastic action by the Cuban Government would deprive Jorge of his right to sue, we did not limit our holding to the restricted scope of the Cuban "intervention". Alternatively, we concluded that

> in light of the fact that the government of Cuba did not have physical control over the species of property represented by this claim against Standard Cigar Company, it would not be a violation of the Act of State doctrine for the courts to hold that, *had the Cuban Government taken all of the steps that its unlimited power would have permitted it to take,* such conduct by the Cuban Government would not be recognized by the United States Courts. (Emphasis added.)

392 F.2d at 714. We noted that "in the *Sabbatino* case the *res* that was subject

to confiscation by the Cuban Government was physical property present in Cuba; whereas the *res* here is a credit owed by an American company in Tampa, Florida." Id. We then explained the basis for our alternative holding:

The underlying thought expressed in all of the cases touching on the Act of State Doctrine is a common-sense one. It is that when a foreign government performs an act of state which is an accomplished fact, that is when it has the parties and the *res* before it and acts in such a manner as to change the relationship between the parties touching the *res*, it would be an affront to such foreign government for courts of the United States to hold that such act was a nullity. Furthermore, it is plain that the decisions took into consideration the realization that in most situations there was nothing the United States Courts could do about it in any event.

In the case before us, it cannot be doubted that whatever may be the ordinary concept of the situs of a debt, the government of Cuba was not physically in a position to perform a *fait accompli* in the nature of the acquisition by the Cuban government or its intervenor of the money owed to Tabacalera by Standard Cigar Company. It was simply not within the power of Cuba to accomplish this result. To this extent, we think it clear that whatever efforts were made by the Cuban government dealing with Tabacalera these acts are to be recognized under the Act of State Doctrine only insofar as they were able to come to complete fruition within the dominion of the Cuban government. As to other matters we conclude that they were not a "taking of property *within its own territory*" within the language used by the Supreme Court in *Sabbatino*. 392 F.2d at 715–16 (emphasis in original).

*Tabacalera* and its predecessors teach that the federal courts are to take a pragmatic view of what constitutes an extraterritorial action by a foreign state. A foreign dissolution, if effective to destroy the "existence" of a foreign corporation and its claims to ownership of property in the United States, would allow the foreign sovereign to control (at least in a negative way) the disposition of valuable assets within the United States. As the Second Circuit observed in *Zwack, supra*, "it is clear that the Hungarian government could not directly seize the assets which have a situs in the state of the [American] forum. To allow it to do so indirectly through confiscation of firm ownership would be to give its decree extraterritorial effect and thereby emasculate the public policy of the forum against confiscation." 237 F.2d at 259. Likewise, the expropriation and dissolution of Nueva Fabrica would not dictate affirmatively the right to enjoy the Malta Cristal trademark in this country, but the foreign sovereign's actions would dictate forfeiture of the United States trademark rights by the former owners of Nueva Fabrica. "[T]he former owners . . . would be forever foreclosed from the benefits accruing from the good name of their products." *F. Palicio y Compania, supra*, 256 F.Supp. at 492.

Consequently, we hold that it is appropriate to treat the dissolution of Nueva Fabrica under Cuban law as a foreign decree purporting to expropriate property located within the United States, insofar as ownership of the Malta Cristal trademark is concerned. We hold that it is our duty to assess, as a matter of federal law, the compatibility with the laws and policy of this country of depriving the original owners of the Malta Cristal trademark of that property without compensating them for it. We conclude that such a deprivation without compensation would violate bedrock principles of this forum, embodied in the Fifth Amendment to the Constitution. Republic of Iraq v. First National City Bank, 2 Cir. 1965, 353 F.2d 47, cert. den., 382 U.S. 1027, 86 S.Ct. 648, 15 L.Ed.2d 540; *F. Palicio y Compania, supra*.

## III.

This conclusion does not necessarily explain how the former owners of Nueva Fabrica retained the right to dispose of Nueva Fabrica's United States trademark when their ship was sunk from beneath them. However, in tracing ownership of United States property cast adrift by the "extraordinary and basically unfair measure" of expropriation without compensation, "our courts have developed a willingness to disregard technicalities in favor of equitable considerations." *Carl Zeiss Stiftung, supra,* 293 F.Supp. at 898. We accept the traditional explanation for the continuing dominion of former owners over property with an American situs: the former owners retain equitable title to the American property. *Zwack, supra,* 237 F.2d at 259; Vladikavkazsky R. Co. v. N. Y. Trust Co., 263 N.Y. 369, 189 N.E. 456. Alternatively, it might be said that the dissolution is effective in the foreign state, but the corporation retains a *de facto* existence in the United States beyond the territorial reach of the confiscating government.

But we do not lay great stress on the subtleties of the concepts of continued dominion over property located within the United States. Our decision today, our prior decision in *Tabacalera,* and those of our brother courts as well are based upon the fundamental realization that to sustain the reasoning of the district court in the present case would, in practical terms, mean the end of territorial restriction on the Act of State doctrine.

## IV.

We are mindful that *Sabbatino* could be interpreted as removing the traditional territorial restriction upon the Act of State doctrine, despite the Court's explicit language that its holding extended only to acts of a foreign state "within its own territory." *Sabbatino* was, after all a suit by the National Bank of Cuba to recover monies located in the United States. Arguably, the location of the *Sabbatino* funds casts doubt on the notion that Acts of State entitled to unquestioning recognition must "come to complete fruition within the foreign state," for Cuba was not "physically in a position to perform a fait accompli" to gain possession of the monies it sued for in the Southern District of New York.

But the argument confuses the perfection of an Act of State with the perfection of certain legal relationships arising from an Act of State. In *Sabbatino,* the expropriation of sugar constituting the Act of State "came to complete fruition within the dominion of the Cuban government." To deny Banco Nacional's claim to the proceeds of the expropriated property, a federal court would have to examine the propriety of the completed confiscation. In contrast, where the assets in dispute are situated outside the foreign state, as in *Tabacalera* and the present case (among others), the Act of State itself remains incomplete in the absence of acquiescence by the forum state. To paraphrase *Tabacalera,* there is something the forum state can do to prevent the expropriation, because the property is plainly within the physical control of the forum state.

This emphasis on the completion of the Act of State squares with the policy considerations articulated in the *Sabbatino* decision. The doctrine has "constitutional underpinnings", and its vitality "depends on its capacity to reflect the proper distribution of functions between the judicial and political branches of the Government in matters bearing on foreign affairs." *Sabbatino, supra,* 376 U.S. at 427, 84 S.Ct. at 940, 11 L.Ed.2d at 823. The obvious inability of a foreign state to complete an expropriation of property beyond its borders reduces the foreign state's expectations of dominion over that property; "the concept of territorial sovereignty is . . . deep seated. . . ." *Sabbatino, supra,* 376 U.S. at 431–432, 84 S.Ct. at 942. Consequently, the potential for offense to the foreign state is reduced, there is less danger that judicial disposition of the property will "vex the peace of nations,"

and there is less need for judicial deference to the foreign affairs competence of the other branches of government. See Note, 1966 Duke L.J. 828, 833.

The implications for American foreign relations flowing from judicial consideration of actions of foreign states purporting to affect American property are concededly different only in degree from the implications of judicial consideration of foreign acts done within the foreign territory. See Henkin, The Foreign Affairs Power of the Federal Courts: *Sabbatino*, 64 Colum.L.Rev. 805, 828 (1964). But we think the Supreme Court made clear in *Sabbatino* that it did not intend to "[lay] down or [reaffirm] an inflexible and all-encompassing rule in this case. . . . " *Sabbatino, supra*, 376 U.S. at 428, 84 S.Ct. at 940. In deed, the Court listed several variables to be weighed carefully in arriving at "the balance of relevant considerations" governing the participation of the federal courts in matters concerning actions taken by foreign nations. Among these variables was the sensitivity of a particular dispute:

> It is also evident that some aspects of international law touch more sharply on national nerves than do others; the less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches.

*Sabbatino, supra*, 376 U.S. at 428, 84 S. Ct. at 940.

The Supreme Court provides no explicit guide to this determination, but it cites with approval its statement in Baker v. Carr that "it is error to suppose that every case or controversy which touches upon foreign relations lies beyond judicial cognizance." Baker v. Carr, 1962, 369 U.S. 186, 211, 82 S.Ct. 691, 707, 7 L.Ed.2d 663. The opinion in Baker v. Carr continues:

> Our cases in this field seem invariably to show a discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its

susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action.

*Id.*

We recognize, of course, that the foreign relations aspect of the political question doctrine is not the same as the Act of State doctrine. Yet we think the considerations are sufficiently similar to justify brief consideration of the "sensitivity determinants" outlined in Baker v. Carr as we consider the specific facts of the case before us in the manner counseled by *Sabbatino*. First, as the cases demonstrate beyond question, the judicial branch has long exercised jurisdiction over property with an American situs sought to be expropriated by foreign states. Baglin v. Cusenier, for example, was decided more than sixty years ago. Second, we note that the nature and posture of the present case is appropriate for judicial disposition. The dispute between the parties involves traditional issues of federal trademark law and it is fully within the power of the court to execute whatever decision in may deem proper. In addition, as we have already stated, a decision on the merits of this controversy need not question or even address the propriety of those actions taken by the Cuban Government within Cuba affecting the property of Nueva Fabrica located there and the corporate form of Nueva Fabrica. Finally, we note that there is no reason to fear the consequences of a decision in this case for relations between Cuba and the United States. Unlike other litigation, including *Sabbatino*, growing out of the economic policies of the Castro regime, neither the Cuban Government, nor any arm of that government, nor any party in privity with the Cuban government is a litigant or expresses any interest in the outcome of this litigation. Any offense to the Cuban state is purely hypothetical. Moreover, the posture of the Cuban government during recent litigation in another Circuit involving extraterritorial assets leads us to have even further doubts that this issue is one

which might possibly inflame or embarrass the conduct of American foreign relations with Cuba.[4]

## V.

■ We say nothing of the other issues raised in the pleadings below. Nor do we address ourselves to problems concerning the right of any particular individual or group of individuals to act in the United States on behalf of an enterprise dissolved by a foreign sovereign. Compare *Carl Zeiss Stiftung*. There is no suggestion of any such dispute on the record before us today. We hold only that the expropriation of Nueva Fabrica de Hielo, S. A., and the resulting dissolution of the corporation under Cuban law neither deprived the acknowledged former owners and fiduciaries of the corporation of the right to make an effective assignment of the dissolved corporation's United States trademark nor cancelled that trademark.

Reversed and remanded for further proceedings.

SIMPSON, Circuit Judge (dissenting):

I would affirm this case on the basis that when the assets of Nueva Fabrica de Hielo, S. A., were confiscated by the government of Cuba in October, 1960, that corporation was, under Cuban law, dissolved. The purported assignment of the trademark by the non-existent Cuban corporation in 1965 was a nullity. The mark "Malta Cristal" was in the public domain when the appellee commenced using it. The suit was properly dismissed by the trial court on the ground that neither appellant had standing to maintain it.

4. See Banco Nacional de Cuba v. First National City Bank, S.D.N.Y.1967, 270 F.Supp. 1004, rev'd, 2 Cir. 1970, 431 F. 2d 394, remanded for further consideration, 400 U.S. 1019, 91 S.Ct. 581, 27 L. Ed.2d 630, prior reversal reaffirmed, 2 Cir. 1971, 442 F.2d 530, cert. granted, 404 U.S. 820, 92 S.Ct. 79, 30 L.Ed.2d 48 (Oct. 12, 1971). As the original district court opinion states in part V, 270 F.Supp. at 1011, Banco Nacional

With deference to the contrary view so well set forth for the majority by Judge Wisdom, I dissent.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.

Judge Simpson dissents for the reasons stated in his dissent to the original opinion to the panel.

laid claim in its original complaint to funds deposited in accounts in New York by Cuban banks whose assets, through confiscation, were declared to be the property of Banco Nacional. The district court "speedily disposed of" this claim, citing *Republic of Iraq, supra,* and *F. Palicio v. Compania, supra.* Banco Nacional abandoned the cause of action on appeal. 431 F.2d at 394.